**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**
Appeal No.: 21-13469-GG
LT Case No.: 0:20-cv-60666-AHS

**JESSICA GRAVES**,

     Appellant,

v.

**BRANDSTAR STUDIOS, INC.**,

     Appellee.

_____/

**APPEAL FROM THE DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA**

---

**APPELLEE'S BRIEF**

---

Richard D. Tuschman, Esq.
Florida Bar No. 907480
rtuschman@gtemploymentlawyers.com
assistant@gtemploymentlawyers.com
**RICHARD D. TUSCHMAN, P.A.**
12555 Orange Drive, 2nd Floor
Davie, Florida 33330
Telephone: (954) 369-1050
Fax: (954) 380-8938
*Attorney for Appellee*

## APPELLEE'S CERTIFICATE OF INTERESTED PERSONS

Counsel for Appellee, BrandStar Studios, Inc., hereby certifies, in accordance with Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1 and the Order dated October 14, 2021, that the following persons may have an interest in the outcome of this case:

### Interested Persons

1.  Honorable Raag Singhal, United States District Judge

2.  Jessica Graves, Appellant

3.  Cornell & Associates, P.A., Counsel for Appellant

4.  G. Ware Cornell, Jr., Counsel for Appellant

5.  BrandStar Studios, Inc., Appellee

6.  Richard D. Tuschman, P.A., Counsel for Appellee

7.  Richard D. Tuschman, Counsel for Appellee


DATED: February 3, 2022

Respectfully submitted,

*/s/ **Richard D. Tuschman***
Richard D. Tuschman, Esq.
Florida Bar No. 907480
rtuschman@gtemploymentlawyers.com
assistant@gtemploymentlawyers.com
**RICHARD D. TUSCHMAN, P.A.**
12555 Orange Drive, 2nd Floor
Davie, Florida 33330
Telephone: (954) 369-1050
Fax: (954) 380-8938
*Attorney for Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee, BrandStar Studios, Inc. ("BrandStar"), believes that oral argument is unnecessary. There are no unique legal issues, as this case involves the straightforward application of well-established legal principles to undisputed material facts. Thus, the Court's decisional process would not be significantly aided by oral argument.

# **TABLE OF CONTENTS**

**PAGE**

Certificate of Interested Persons and Corporate Disclosure Statement .....................2

Statement Regarding Oral Argument ......................................................................3

Table of Contents ............................................................................................. 4-5

Table of Citations ............................................................................................. 6-8

Statement of the Issues .........................................................................................9

Statement of the Case.................................................................................... 10-14

Summary of the Argument.............................................................................. 14-16

Argument and Citations of Authority ......................................................................16

Point I:     The District Court Correctly Dismissed Graves' FMLA
             Claim Because She Did Not Notify BrandStar of
             Her Need for FMLA Leave.................................................. 16-17

    A.     Employer and Employee Notice Obligations Under
           the FMLA......................................................................... 17-19

    B.     BrandStar Met its General Notice Obligations to Graves..........20

    C.     Graves Failed to Notify BrandStar of a Need
           for FMLA Leave in Connection with Her Trip to
           Pennsylvania in Early May 2018 ................................................21-22

    D.     Even Assuming BrandStar Was Required to Provide
           Eligibility and Rights and Obligations Notice to Graves
           In Connection with Her Trip to Pennsylvania, Graves
           Received PTO and Was Not Prejudiced ................................22-23

    E.     Graves Failed to Notify BrandStar of a Need for
           FMLA Leave When She Returned from Pennsylvania ........23-27

F.    Graves' Employment Was Terminated for Performance Deficiencies Unrelated to Any Possible FMLA-Qualifying Event ............................................................................27-28

G.    The Eleventh Circuit's Decisions in *Ramji* and *Munoz* Do Not Support Graves' Argument .........................................28-32

H.    Graves' Declaration Does Nothing to Change the Analysis ...........................................................................32-34

Point II:    The District Court Correctly Dismissed Graves' ADA Associational Discrimination Claim (Count I) Because She Failed to Identify Any Evidence That Her Termination Was a Result of Her Father's Illness, As Opposed to Her Well-Documented Performance Deficiencies ................... 34-35

A.    Graves Failed to Establish a *Prima Facie* Case of Associational Discrimination ............................................... 35-37

B.    There is No Evidence That BrandStar's Reasons for Terminating Graves Were Pretextual ................................. 37-39

Point III    The District Court Did Not Impermissibly Weigh Evidence ...........................................................................39-41

Conclusion ..........................................................................................41

Certificate of Compliance .........................................................................42

Certificate of Service ...............................................................................43

## <u>TABLE OF CITATIONS</u>

**CASES**                                                                    **PAGE**

*Beqiri v. Nelco, Inc.*
No. 3:05-CV-803-H, 2007 U.S. Dist. LEXIS 40447, at \*5
(W.D. Ky. June 4, 2007)..................................................................21

*Columbia Lawnwood Regional Medical Center*
54 F. Supp.2d 1159, 1165 (S.D. Fla. 1999).....................................34

*Cordoba v. Dillard's Inc.*
419 F.3d 1169, 1181 (11th Cir. 2005) ..............................................32

*Cruz v. Publix Super Mkts., Inc.*
428 F.3d 1379, 1383 (11th Cir. 2005) ..............................................25

*Cusick v. Yellowbook, Inc.*
607 F. App'x 953, 955 (11th Cir. 2015) ...........................................35

*Demers v. Adams Homes of Northwest Fla., Inc.*
321 F. App'x 847, 849 (11th Cir. 2009)...........................................22

*Drago v. Jenne*
453 F.3d 1301 1307 (11th Cir. 2006) ...............................................28

*Fioto v. Manhattan Woods Enterprises LLC*
123 Fed. Appx. 26, 28 (2nd Cir. 2005)............................................22

*Gogel v. Kia Motors Mfg. of Ga.*
967 F.3d 1121, 1137 n.15 (11th Cir. 2020) ......................................37

*Hilburn v. Murata Elecs. N. Am*., Inc.
181 F.3d 1220, 1230-31 (11th Cir. 1999).......................34, 35, 37, 38

*Lievre v. JRM Constr. Mgmt., LLC*
No. 17-CV-4439 (BCM), 2019 U.S. Dist. LEXIS 161449, at \*35
(S.D.N.Y. Sep. 20, 2019)..................................................................33

*Marks v. Orion Med. Enters.*
No. 10-20121-CIV-Graham/Torres, 2010 U.S. Dist. LEXIS 151130, at *7
(S.D. Fla. Sep. 29, 2010) ...............................................................................23

*Matamoros v. Broward Sheriff's Office*
2 F.4th 1329 (11th Cir. 2021) ................................................................13, 14

*Munoz v. Selig Enterprises, Inc.*
981 F.3d 1265, 1276-77 (11th Cir. 2020).........................................28, 30, 31

*Nicholson v. Pulte Homes Corp.*
690 F.3d 819, 826 (7th Cir. 2012) .....................................................18, 19, 33

*Ragsdale v. Wolverine World Wide, Inc.*
535 U.S. 81, 89, 122 S. Ct. 1155, 1161 (2002) ...........................................22

*Ramji v. Hospital Housekeeping Sys., LLC*
992 F.3d 1233 (11th Cir. 2021) ...................................................13, 28, 29, 30

*Reinholm v. Am. Airlines*
No. C07-1429RSL, 2009 U.S. Dist. LEXIS 41502, at *10
(W.D. Wash. May 15, 2009) ..........................................................................26

*Taylor v. Odom's Tenn. Pride Sausage, Inc.*
No. 4:08CV02833 SWW, 2010 U.S. Dist. LEXIS 21172, at *18
(E.D. Ark. Mar. 8, 2010) ...............................................................................26

*Wascura v. City of S. Miami*
257 F.3d 1238, 1242-43 (11th Cir. 2001).....................................................35

*White v. Beltram Edge Tool Supply, Inc.*
789 F.3d 1188, 1191 (11th Cir. 2015) ...........................................................17

## LEGISLATIVE HISTORY

H.R. Rep. No. 101-485, pt.2, at 61-62. .....................................................34

## REGULATIONS

29 C.F.R. § 825.124 .....................................................................................26

29 C.F.R. § 825.300(a)................................................................17

29 C.F.R. § 825.300(b)(1)......................................................18, 40

29 C.F.R. § 825.300(c)(1).........................................................18

29 C.F.R. § 825.302................................................................17

29 C.F.R. § 825.302(c).............................................................25

29 C.F.R. § 825.302(d).........................................................18, 41

29 C.F.R. § 825.303(c).......................................................17, 8, 41

**STATUTES**

29 U.S.C. § 2612 (a)(1)(C) ......................................................16

29 U.S.C. § 2615(a)(1)...........................................................16

## STATEMENT OF THE ISSUES[1]

1.     Did the District Court err in dismissing Graves' claim under the Family and Medical Leave Act ("FMLA") (Count III) on the grounds that she did not provide the requisite notice to BrandStar of her need for FMLA leave?

2.     Did the District Court err in dismissing Graves' claim for associational discrimination under the Americans with Disabilities Act ("ADA") (Count I) on the grounds that Graves failed to identify any evidence that her termination was a result of her father's illness, as opposed to her well-documented work performance deficiencies?

3.     Did the District Court impermissibly weigh evidence and fail to follow controlling Supreme Court precedent?

---

[1] For the Court's convenience, BrandStar is listing the issues in the same order as Graves has listed them in her brief.

## STATEMENT OF THE CASE

BrandStar is a content marketing and production company that provides a wide range of media services, including television production for such shows as Military Makeover and Designing Spaces. [Doc. 22-4, p. 1] BrandStar hired Appellant, Jessica Graves, as a producer/writer in January 2017. [Doc. 22-1, p. 24] BrandStar terminated Graves' employment in May 2018 based on longstanding performance deficiencies – poor communication and attendance, not completing her work, and being disrespectful to her supervisors. [Doc. 22-4, p. 2] Graves' supervisors, Aharon Bettan and Arash Farsi, documented these deficiencies and counseled Graves about them for nine months before her termination. [Doc. 22-4, p. 2] Farsi reported that Graves frequently failed to report to work on time or left early for personal reasons. [Doc. 22-4, p. 2] Graves admitted that Bettan repeatedly objected to her "coming and going." [Doc. 22-1, p. 41] Graves admitted that Bettan believed Graves was disrespectful to him and that he believed Graves was unprepared for edit sessions. [Doc. 22-1, pp. 60-61] Graves admitted that editors did not feel they were getting the support from her they needed. [Doc. 22-1, p. 73] Graves admitted that these editors also believed she was unprepared for edit sessions. [Doc. 22-1, p. 73] Graves admitted "it's possible" she was not getting all her work done. [Doc. 22-1, p. 67] There is no evidence that *any* of these issues had any connection with the illness of Graves' father, who was living in Pennsylvania

during Graves' employment and who happened to become critically ill a few weeks before Graves' termination. [Doc. 22-4, p. 2-3] Nevertheless, this alleged connection is the foundation of Graves' lawsuit.

On May 20, 2020, Graves filed her Amended Complaint [Doc. 8] alleging that BrandStar violated the Americans with Disabilities Act ("ADA"), the Florida Civil Rights Act, and the Family and Medical Leave Act ("FMLA"), when it terminated her employment while she was preparing to move her father from Pennsylvania to Florida. In Count I, Graves asserted that BrandStar violated the ADA by discriminating against Graves "as the caregiver for a close family member in violation of the ADA." [Doc. 8, p. 7] In Count II, Graves alleged that BrandStar "deprived Plaintiff of her rights under the Florida Civil Rights Act." [Doc. 8, p. 8] (Although Graves did not specify those "rights," it became clear in her response to Defendant's Motion for Summary Judgment that she was alleging the same violation as in Count I – associational disability discrimination. [Doc. 25, p. 14]) In Count III, Graves alleged that BrandStar interfered with her rights under the FMLA when it failed to advise her of her FMLA rights and subsequently terminated her employment. [Doc. 8, p. 9]

On December 18, 2020, upon the close of discovery, BrandStar moved for summary judgment [Doc. 21] on the following grounds:

- Graves' claim under the ADA (Count I) fails as a matter of law because:

(a) Graves was indisputably terminated for performance deficiencies unrelated to the care for her father; and (b) even assuming the truth of Graves' claim that she was terminated because she could not travel for work while preparing to move her father to Florida, this would not support an association-based discrimination claim under the ADA. The purpose of the associational provision of the ADA is to prevent an employer from making an unfounded assumption that an employee who has an association with a disabled person will miss work to care for that person. The ADA does not require employers to accommodate nondisabled employees to care for a disabled family member or, in Graves' case, to prepare to move that person from one state to another.

- Graves' claim under the Florida Civil Rights Act (Count II) fails because: (a) there is no cause of action under the Florida Civil Rights Act for associational discrimination; and (b) even assuming such a claim existed, it would fail for the same reasons that Graves' claim for associational discrimination under the ADA fails.

- Graves' interference claim under the FMLA (Count III) fails because: (a) Graves did not put BrandStar on notice that she needed leave under the FMLA when she missed two days of work to visit her father in the hospital; (b) Graves was not prejudiced by BrandStar's failure to designate her two-day absence from work as FMLA-qualifying; (c) Graves did not ask for any leave to prepare to move her

father from Pennsylvania to Florida; (d) such preparations do not constitute "care" for a family member under the FMLA; and (e) Graves' employment was indisputably terminated for performance deficiencies unrelated to any possible FMLA-qualifying event.

Graves filed a Memorandum in Opposition to BrandStar's Motion for Summary Judgment on January 11, 2021. [Doc. 25] BrandStar filed a Reply Memorandum on January 19, 2021. [Doc. 29]

On April 7, 2021, Graves filed a Notice of Supplemental Authority [Doc. 35] and sought leave to file additional briefing in view of this Court's decision the previous day in *Ramji v. Hospital Housekeeping Sys., LLC*, 992 F.3d 1233 (11th Cir. 2021). BrandStar opposed the request for supplemental briefing. [Doc. 37] On July 6, 2021, the District Court granted Graves' motion [Doc. 40] Thereafter, both parties briefed the applicability of *Ramji* [Docs. 42 & 43]

On September 17, 2021, the District Court granted BrandStar's motion for summary judgment. [Doc. 44]

On October 11, 2021, Graves filed a Notice of Appeal [Doc. 48] Graves is appealing the District Court's order as to Count I (ADA) and Count III (FMLA). Graves has withdrawn her appeal as to Count II, her claim for associational discrimination under the Florida Civil Rights Act, in light of this Court's recent holding in *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329 (11th Cir. 2021).

[Brief at 13] In *Matamoros*, this Court held that the Florida Civil Rights Act does not prohibit discrimination based on a plaintiff's association with a disabled person. *Id*. at 1332.

## SUMMARY OF THE ARGUMENT

The District Court properly dismissed Graves' FMLA interference claim (Count III) because Graves did not notify BrandStar of her need for FMLA leave. Absent such notice from Graves, BrandStar's mere knowledge that Graves' father, who was living in Pennsylvania, had a serious medical condition did not obligate BrandStar to inform Graves that she was eligible for leave under the FMLA. Graves did not request leave in the weeks preceding her termination; she testified that she wanted to keep working. [Doc. 22-1, p. 115] Moreover, the reason Graves claims that BrandStar was on notice of her need for leave – that BrandStar knew she was planning to convert her garage into a studio apartment and move her father to Florida – is not the type of care for a family member that is protected by the FMLA. Additionally, even assuming *arguendo* that BrandStar had a duty to advise Graves of her FMLA eligibility, Graves' interference claim still fails because she cannot show that BrandStar's failure to do so resulted in any adverse employment action. Graves was terminated because of poor communication and attendance, for not completing her work, and for being disrespectful, and because her performance was continuing to deteriorate despite numerous counselings from her supervisors, who

were continuing to receive complaints about Graves from her co-workers. [Doc. 22-4, p. 2] Graves' father's medical condition had no bearing on the termination decision. [Doc. 22-4, p. 2] As the District Court noted, [t]here is no evidence to suggest otherwise despite Plaintiff's claims to the contrary." [Doc. 44, p. 6]

The District Court properly dismissed Graves' claim for associational discrimination under the ADA (Count I) because she failed to identify any evidence that her termination was a result of her father's illness, as opposed to her well-documented performance deficiencies. [Doc. 44, p. 9] In the District Court, Graves speculated that BrandStar terminated her because she was unable to travel due to her father's future move to Florida. [Doc. 22-1, pp. 112-113, 115-116] But even if this theory were true (and there is no evidence supporting it), it would not support Graves' claim of associational discrimination because BrandStar had no duty under the ADA to accommodate Graves' inability to travel.

In granting summary judgment to BrandStar, the District Court did not impermissibly weigh the evidence in violation of Supreme Court precedent. Contrary to Graves' argument, the District Court did not reject Graves' assertion that BrandStar failed to notify her of her eligibility to take FMLA leave. The District Court's ruling that Graves did not notify BrandStar of her need for FMLA leave was correct and means that BrandStar had no obligation to notify Graves of her FMLA eligibility. FMLA regulations and case law are clear on this point – an employer has

no obligation to notify an employee of her eligibility for FMLA leave until the employee requests FMLA leave, or the employer acquires knowledge that the employee's leave may be for an FMLA-qualifying reason. *See* 29 C.F.R. §825.300(b)(1). Neither happened in this case. Graves' argument that the District Court "sarcastically discredited" Graves' evidence is also without merit. The evidence at issue – that Graves accidentally clocked in to work when she traveled to Pennsylvania to visit her father in the hospital – was not disputed by BrandStar. The District Court's ruling was based on the undisputed facts of the case, with all inferences resolved in Graves' favor.

## ARGUMENT AND CITATIONS OF AUTHORITY

### POINT I

**THE DISTRICT COURT CORRECTLY DISMISSED GRAVES' FMLA CLAIM BECAUSE SHE DID NOT NOTIFY BRANDSTAR OF HER NEED FOR FMLA LEAVE.**

The FMLA permits eligible employees up to 12 weeks of leave from work "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." *See* 29 U.S.C. §2612 (a)(1)(C). An employer may not interfere with, restrain, or deny the exercise of any right provided under the FMLA. 29 U.S.C. §2615(a)(1). An interference claim under the FMLA has two elements: (1) the employee was entitled to a benefit

under the FMLA; and (2) her employer denied her that benefit. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

### A. Employer and Employee Notice Obligations Under the FMLA.

FMLA regulations impose notice obligations on both employers and employees. As an initial matter, employers have an obligation to post a general notice explaining the FMLA's provisions to employees and, "[i]f an FMLA-covered employer has any eligible employees, it shall also provide this general notice to each employee by including the notice in employee handbooks or other written guidance to employees concerning employee benefits or leave rights, if such written materials exist, or by distributing a copy of the general notice to each new employee upon hiring." 29 C.F.R. §825.300(a).

If an employer has met its general notice obligations, then it is up to the employee to provide notice of the employee's need for FMLA leave to the employer. Where the need for leave is foreseeable, the employee "shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302. "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(c). In either case, an employer may require that the employee "comply with the employer's usual

and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302(d); § 825.303(c).

If the employee provides proper notice to the employer of the need for FMLA leave, then the employer must provide two other types of notice to the employee – eligibility notice and rights and responsibilities notice. "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). Additionally, "[e]mployers shall provide written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.300(c)(1).

It follows that if the employee does *not* provide notice to the employer of a need for FMLA leave, the employer's mere knowledge that the employee's family member has a serious health condition does not trigger any further FMLA obligations on the employer's part. The Seventh Circuit's decision in *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2012), illustrates this point. The *Nicholson* court noted that "if Nicholson provided sufficient notice that she needed time off to care for her seriously ill parents, then Pulte [the employer] had a duty to inquire further to confirm Nicholson's FMLA entitlement." *Id*. at 826 (citations

omitted). However, no such duty arose when Nicholson only informed her supervisor, Maria Wilhelm, "that she was driving her mother to medical appointments *on her days off* and that she could not work *outside her normal hours* because of her responsibilities to her parents. Nicholson never indicated that she needed time off to care for her mother; nor did she describe the seriousness of her mother's condition." *Id*. (emphasis in original). As for her father, Nicholson told Wilhelm that his diagnosis had worsened to stage III cancer but did not mention a possible need for additional time off. *Id*. at 827. On these facts, the court held that there was no FMLA interference. *Id*. "While Wilhelm was alerted to the seriousness of plaintiff's father's health condition, she was not on notice that Nicholson needed medical leave to care for him." *Id*.

The *Nicholson* holding not only is consistent with FMLA regulations, but it also comports with common sense. Employees whose family members have a serious health condition do not always require leave from work to care for them. If the employee does not request leave from work, the employer has no reason, and no obligation under the FMLA, to provide eligibility notice and rights and responsibilities notice to the employee. As we shall see, that is exactly what happened in this case.

**B. BrandStar Met its General Notice Obligations to Graves.**

BrandStar met its general notice obligations to Graves upon hiring by providing to her BrandStar's Employee Handbook, which a contained a FMLA policy. [Doc. 22-1, pp. 24-25, Doc. 22-2, p. 59 (DEF 246)][2] The policy expressly applied to leave for the serious health condition of family members. [Doc. 22-2, p. 59 (DEF 246)] The policy required that employees fill out two forms, to be provided by the Human Resources Department, when they request FMLA leave – a FMLA Medical Certification Form (to be completed by the healthcare provider) and a FMLA notification form. [Doc. 22-2, p. 59 (DEF 246)] In her brief, Graves does not dispute that BrandStar met its general notice obligations. *See* Brief at 14 (stating that only eligibility notice and rights and responsibilities notice are relevant in this case).

Graves argues that BrandStar failed to provide eligibility notice and rights and responsibilities notice to Graves. [Brief at 18] But in order for this Court to reach that conclusion, it would first have to find that Graves met *her* obligation to notify BrandStar of her need for FMLA leave. As explained below, the record permits no such finding.

---

[2] To avoid confusion, when an exhibit to Graves' deposition is cited, BrandStar cites to the page number in the record where the exhibit is located as well as the Bates number of the document, e.g., "DEF 246".

### C. Graves Failed to Notify BrandStar of a Need for FMLA Leave in Connection with Her Trip to Pennsylvania in Early May 2018.

On Wednesday, May 2, 2018, Graves notified several BrandStar employees, including her supervisors Aharon Bettan and Arash Farsi, that she was "planning to fly out to see my dad in PA tomorrow morning" because he was "in ICU" [Doc. 22-1, pp. 140-141, Doc. 22-2, p. 47 (DEF 171)] Graves claims she did not work on May 3 or 4, 2018, although Bettan later emailed Graves to inquire why she clocked in on those days. [Doc. 22-1, p. 141, Doc. 22-2, p. 54 (DEF 187)] Graves claims she "accidentally" clocked in on those days because she had problems using the timekeeping application on her phone. [Doc. 22-1, pp. 141-144] Graves admits that if BrandStar's Human Resources Consultant, Kayla Patregnani, had checked to see if Graves was working while in Pennsylvania, she would have seen Graves logged in to the system. [Doc. 22-1, pp. 145] Graves did not correct her error until May 14, 2018, when Bettan instructed her to submit her time for May 3 and 4 as paid time off ("PTO"). [Doc. 22-2, p. 54 (DEF 187)] Even then, Graves did not ask Patregnani for the forms needed to request FMLA leave as required by the company's FMLA policy. [Doc. 22-1, pp. 26-28]

Because Graves merely informed her supervisors that she was planning to "fly out to see my dad" because he was "in ICU", BrandStar was not on notice that Graves needed to care for him. *See Beqiri v. Nelco, Inc.*, No. 3:05-CV-803-H, 2007 U.S. Dist. LEXIS 40447, at *5 (W.D. Ky. June 4, 2007) ("Visiting a parent in the

hospital does not entitle one to FMLA leave; rather the person must be 'needed to care for' the parent.") (citing *Fioto v. Manhattan Woods Enterprises LLC*, 123 Fed. Appx. 26, 28 (2nd Cir. 2005)). Additionally, because Graves clocked in to work remotely on May 3 and 4, BrandStar could not have known then that Graves' physical absence from BrandStar's offices was even a leave from work; Graves sometimes worked remotely. [Doc. 22-1, pp. 41, 45, 51-52, 113] When Bettan instructed Graves to submit her time for May 3 and 4 as PTO, Graves still failed to request FMLA forms. In short, the record shows that Graves did not notify BrandStar of her need for FMLA leave when she traveled to Pennsylvania for two days in early May 2018.

### D. Even Assuming BrandStar Was Required to Provide Eligibility and Rights and Obligations Notice to Graves in Connection with Her Trip to Pennsylvania, Graves Received PTO and Was Not Prejudiced.

When an employee receives all of the FMLA leave to which the employee is entitled, the employee has no remedy for the employer's technical violation of the notice requirement. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 1161 (2002). The only exception to this rule is where an employee can show that the employer's failure to give the notice caused some prejudice. *Ragsdale*, 535 U.S. at 90-91; 122 S. Ct. at 1161. *See also Demers v. Adams Homes of Northwest Fla., Inc.*, 321 F. App'x 847, 849 (11th Cir. 2009). ([E]ven where there may have been technical violations of the FMLA, those violations are not compensable where

. . . a plaintiff has failed to demonstrate that he suffered any 'adverse employment action.'").

Graves received the leave she needed in connection with her trip to Pennsylvania; in fact, she was paid for the two days she was out. Accordingly, and because Graves cannot show any prejudice from BrandStar's alleged failure to notify her of her FMLA eligibility and rights and obligations, her interference claim as it relates to her trip to Pennsylvania fails as a matter of law. *See Marks v. Orion Med. Enters.*, No. 10-20121-CIV-Graham/Torres, 2010 U.S. Dist. LEXIS 151130, at *7 (S.D. Fla. Sep. 29, 2010) (granting summary judgment to defendant where plaintiff received the leave she requested pursuant to the defendants' PTO policy and not the FMLA, and there was no evidence of prejudice to plaintiff).

### E. Graves Failed to Notify BrandStar of a Need for FMLA Leave When She Returned from Pennsylvania.

On May 6, 2018, Graves emailed BrandStar's Chief Executive Officer, Mark Alfieri, stating:

> Hi Mark, l just got back from PA where my dad was having emergency brain surgery for a tumor. The aggressive throat cancer that he just finally recovered from last year has metastasized and formed two tumors in his brain. This recent surgery was only able to remove one. the other will need to be treated with radiation and intense chemo and soon.
>
> My dad is a Vietnam Vet who was affected by Agent Orange: He spent his entire career working in the probation and parole system, since retiring he has lived alone in Western PA. He's the kindest. strongest and most stubborn man I've ever known and he's my best friend.

Fortunately, I was able to convince him to let me find the best oncologists and radiologists in South Florida for this next and hopefully final round of treatment, but I will need to move him down here asap. Since the last treatment resulted in pneumonia which required a portion of his lung to be removed and feeding tube chest port to be put in. He nearly died twice.

The reason I'm telling you this is because I'm hoping you can help.

**I have a 2-car garage that I need to convert into a studio apartment and I know that between Ryan/Russ/Edwin/Vince they could knock this out in a few days.**

**l am hoping you'll see the benefit in allowing them a few days to do this within the next couple weeks since we can also turn this into a local Military Makeover UFP**. There are a few companies I can reach out to for materials to help, but l am prepared to pay for everything myself, including labor. **All l need from you is permission to 'borrow' the guys.** I'm around if you want to give me a call otherwise we can discuss Monday. I'm going to be driving him and his beloved dog down to FL once he's released from rehab to begin treatments.

Thanks and talk soon, Jess [phone number]

[Doc. 22-1, pp. 21-22, Doc. 22-2, pp. 48 (DEF 172)] (emphasis added).

Graves argues that in this email, she "revealed her plan to bring her father to South Florida and her need to provide continuous care," and that this email therefore "provided timely and sufficient notice of her need for FMLA leave and notice of her rights." [Brief at 16] This argument is specious for two reasons.

First, Graves' email to Alfieri was *not* a request for leave from work.  In the email, Graves advised Alfieri of her father's medical condition, requested that she

"borrow the guys" to convert her garage into a studio apartment, and "pitched" a Military Makeover episode that would feature her father, who was a Vietnam veteran. Nowhere did Graves say in the email that she needed leave from work. In fact, Graves admitted in her deposition that she did not *want* leave from work. According to Graves, "I just wanted to be able to keep working… I had no problem working." [Doc. 22-1, p. 115]

While an employee need not expressly assert a right under the FMLA or even mention the FMLA, *see* 29 C.F.R. § 825.302(c), "the notice must be 'sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'" *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383 (11th Cir. 2005) (quoting 29 C.F.R. § 825.302(c)). Graves' email to Alfieri was plainly insufficient under this standard.

Second, even if Graves had requested leave, preparations to move her father to Florida did not constitute "care" as that term is understood under the FMLA. FMLA regulations define "care" for a family member as follows:

> The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

> The term also includes situations where the employee may be needed
> to fill in for others who are caring for the family member, or to make
> arrangements for changes in care, such as transfer to a nursing home.

29 C.F.R. § 825.124.

"The foregoing language makes clear that the FMLA does not provide leave to cover *any* activity intended to assist a family member." *Taylor v. Odom's Tenn. Pride Sausage, Inc.*, No. 4:08CV02833 SWW, 2010 U.S. Dist. LEXIS 21172, at *18 (E.D. Ark. Mar. 8, 2010) (emphasis supplied). In *Taylor*, the court held that the employee's actions in helping out his father tear out floors and repair doors to "pick the house up again" was not "care" for a family member as contemplated by the FMLA. *Id*. Similarly, in *Reinholm v. Am. Airlines*, No. C07-1429RSL, 2009 U.S. Dist. LEXIS 41502, at *10 (W.D. Wash. May 15, 2009), the employee wanted FMLA leave "to fix things up around the house while [his] son was in custody." The court held that "[m]aking home repairs under these circumstances is not 'care' as contemplated by the FMLA." *Id*. The court noted that "[a]lthough there are a myriad of 'family' issues which might impact an employee's job performance, not all of those issues are covered by the FMLA." *Id*. at * 11.

Graves' father was not even living in Florida in May 2018; he was living in Pennsylvania and did not move to Florida until August 2018, three months after Graves' termination. [Doc. 22-1, pp. 18, 116] Graves' preparations to move her father to Florida are not the type of "care" for a family member that is contemplated

by the FMLA. Accordingly, even if Graves had requested leave from work – which she did not do – Graves' preparations to move her father to Florida were not protected by the FMLA and did not impose any FMLA obligations on BrandStar. Additionally, although Graves now claims that she was her father's primary caregiver, even though he was living in Pennsylvania [Brief at 10, 11, 21], Graves points to no evidence to suggest that she informed BrandStar of this fact.

### F. Graves' Employment Was Terminated for Performance Deficiencies Unrelated to Any Possible FMLA-Qualifying Event.

Assuming *arguendo* that Graves had requested leave to prepare to move her father to Florida, and further assuming that such preparations constituted "care" for a family member under the FMLA, or that she informed BrandStar that she needed leave to "care" for her father remotely, Graves' interference claim would still fail because Graves was terminated for poor performance unrelated to her father's illness. Specifically, Graves was terminated because of poor communication and attendance, for not completing her work, and for being disrespectful, and because her performance was continuing to deteriorate despite numerous counselings from her supervisors, who were continuing to receive complaints about Graves from her co-workers. [Doc. 22-4, p. 2] Neither Graves' proposed project to convert her garage into an apartment for her father nor Graves' father's medical condition had any bearing on the decision to terminate Graves' employment. [Doc. 22-4, pp. 2-3] As the District Court noted, [t]here is no evidence to suggest otherwise despite

Plaintiff's claims to the contrary." [Doc. 44, p. 6] Thus, even assuming *arguendo* that BrandStar had a duty to advise Graves of her FMLA eligibility and rights and obligations, Graves cannot show that BrandStar's failure to do so resulted in any adverse employment action. Accordingly, the District Court correctly dismissed Count III of the Complaint. *See Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006) (affirming summary judgment where technical violations of the FMLA did not result in any adverse employment action).

### G. The Eleventh Circuit's Decisions in *Ramji* and *Munoz* Do Not Support Graves' Argument.

Graves argues that the District Court erred in failing to consider this Court's decisions in *Ramji v. Hospital Housekeeping Sys., LLC*, 992 F.3d 1233 (11th Cir. 2021), and *Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1276–77 (11th Cir. 2020). Neither decision is helpful to Graves' case.

In *Ramji*, the plaintiff seriously injured her knee while at work on September 15, 2016. 992 F.3d at 1236. The defendant's FMLA administrator was present when plaintiff injured herself and handled plaintiff's workers' compensation and workplace-injury forms. *Id*. at 1243. After an emergency room visit, plaintiff was excused from work from September 15 through 18. *Id*. at 1242. On September 23, plaintiff attended a follow-up appointment with a doctor, who gave her a cortisone injection in her knee, restricted her to light duty, and referred her to physical therapy sessions occurring two to three times each week for six to eight weeks. *Id*. The

defendant's FMLA administrator personally accompanied plaintiff to follow-up medical appointments and the doctor-prescribed physical-therapy sessions. *Id.* at 1243. Despite these facts, the defendant told plaintiff nothing about her rights under the FMLA, instead handling the injury solely as a workers' compensation claim. *Id.* at 1236. When the plaintiff was unable to pass an essential-functions test, the defendant fired the plaintiff. *Id.* at 1236. The Eleventh Circuit held that defendant "had real-time, sufficient notice of both her need for leave and the nature of her health condition" and "her potential qualification for FMLA leave." *Id.* at 1243. Because the defendant failed to offer plaintiff notice of her FMLA rights at any point during plaintiff's knee-injury recovery, the court held that a reasonable jury could conclude that defendant interfered with plaintiff's FMLA rights. *Id.* at 1244.

*Ramji* stands for the unremarkable proposition that if an employer has reason to know that an employee's absence may be FMLA-qualifying, it must provide the employee with notice of her FMLA rights and cannot rely on the fact that the plaintiff is receiving workers' compensation benefits. As noted by the Eleventh Circuit, "the FMLA does not set up a clash of Titans between itself and workers' compensation. So providing workers' compensation benefits cannot absolve an employer of all obligations under the FMLA." *Id.* at 1237.

The facts of the present case are entirely different. Graves was not injured at work, did not receive workers' compensation benefits, and did not provide notice to BrandStar of a FMLA-qualifying leave from work. *Ramji* is inapposite.

*Munoz* is also distinguishable from the present case, although its conclusion supports the District Court's ruling. In *Munoz*, the plaintiff testified that she informed two vice presidents of the company, Jim Saine and Kent Walker, that she might have uterine fibroids; that she asked to be accommodated for intermittent lateness, early departure, or full-day absences as dictated by her condition and doctor's appointments; that she told Saine and Walker she needed time off for exploratory surgery; and that she had been diagnosed with endometriosis and that she would immediately begin treatment. *Id*. at 1269. The employer never provided Munoz with FMLA certification paperwork. *Id*. The Eleventh Circuit held that "[t]his failure may well have interfered with Ms. Munoz's FMLA rights." *Id*. at 1274. However, the court went on to hold that Munoz could not prevail on her interference claim because she could not show harm from this technical violation because her employer provided her the leave she requested. *Id*. at 1275. The court also rejected Munoz's argument that she was terminated rather than being granted the opportunity to continue to use intermittent FMLA leave. *Id*. The court noted that "Ms. Munoz has not identified any evidence that she was terminated as a result of Selig's failure to give her notice of her FMLA rights." *Id*.

*Munoz* is distinguishable from the present case on the issue of notice to the employer. Munoz provided her employer notice of a FMLA-qualifying condition and asked for leave from work – intermittent or full day absences as well as time off for exploratory surgery. Graves did not put BrandStar on notice of her need for FMLA leave. But on the issue of harm, *Munoz* is applicable to the present case and supports the District Court's ruling. That is, even assuming *arguendo* that BrandStar was required to give notice to Graves of her FMLA eligibility and rights and obligations, Graves cannot show harm from this technical violation because Graves received PTO for her two-day trip to Pennsylvania in early May, and there is no evidence that Graves was terminated as a result of BrandStar's failure to give her such notice.

In her response to BrandStar's Motion for Summary Judgment, Graves speculated that if BrandStar had informed her of her FMLA eligibility upon her return from Pennsylvania, then she might have elected to take FMLA leave. [Doc. 25, p. 13] In that case, she "would not have had attendance issues" and would not have been terminated. [Doc. 25, p. 13] But given the undisputed evidence in this case as to what *actually* occurred – that Graves did not ask for leave because she preferred to continue working, that she informed BrandStar that she was preparing to move her father to Florida (not that she was providing psychological or physical care for him), and that she was terminated for longstanding attendance and

performance problems that existed before and after her father became critically ill –
Graves' speculation as to what *might* have occurred was insufficient to avoid
summary judgment. *See Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir.
2005) (mere speculation is insufficient to create a genuine issue of material fact).

### H. Graves' Declaration Does Nothing to Change the Analysis.

Graves' final points in section I of her Brief claim concern her declaration.
Graves argues that the District Court failed to accept Graves' statements in her
declaration that "[o]bviously if my father were physically present in my house I
would be providing future and perhaps more extensive caregiving" and "I was never
informed by anyone at BrandStar that I was eligible for FMLA to care for my father
remotely or in-person." [Brief at 18-19]

Graves' argument ignores the undisputed facts of the case. When Graves
emailed Alfieri on May 6, 2018, her father was still living in Pennsylvania; he was
not physically present in her house. Graves did not move her father to Florida until
August 2018, three months after her termination. [Doc. 22-1, p. 18] And, as noted
above, Graves did not request leave from work following her return from
Pennsylvania in early May. She testified that she did not even want leave from work.
[Doc. 22-1, p. 115] At most, Graves' email to Alfieri raised the possibility that *in
the future* – after her garage was converted into an apartment and Graves moved her
father to Florida –she *might* need time off to provide care for him. That is a far cry

from putting an employer on notice of a present need for FMLA leave. Again, the

Seventh Circuit's opinion is *Nicholson* is instructive:

> While Nicholson did inform Wilhelm of her father's serious diagnosis,
> she did not communicate that she needed time off to care for him. At
> most, she commented on the *possibility* that she might in the future have
> a need to take time off to care for her father. But Nicholson herself said
> the matter was "left open-ended" because of uncertainties surrounding
> her father's need for care. Thereafter, on just one occasion, she asked
> for—and was granted—a day off to attend a doctor's appointment with
> him. There were no leave requests pending when Naatz and Wilhelm
> decided to terminate Nicholson's employment. Nicholson's
> conversations with Wilhelm were too indefinite to put Pulte on FMLA
> inquiry notice.

690 F.3d at 827 (emphasis in original).

Graves is really asking this Court to impose a new legal obligation on

employers: That once an employer learns an employee's family member has a

serious health condition, it must inform the employer of her FMLA eligibility – even

if the employee does not ask for leave from work and does not want leave from work,

and even if the family member is living in another state. The FMLA imposes no such

obligation on employers, and this Court should not create one. Under the FMLA,

"the *employee* must clearly communicate the need for time off." *Lievre v. JRM*

*Constr. Mgmt., LLC*, No. 17-CV-4439 (BCM), 2019 U.S. Dist. LEXIS 161449, at

*35 (S.D.N.Y. Sep. 20, 2019) (emphasis added; citations omitted). "[A]n 'employer

is not required to be clairvoyant.'" *Id*. Because Graves did not notify BrandStar that

she needed time off for a FMLA-qualifying reason, the District Court properly dismissed Count III of the Complaint.

## POINT II

**THE DISTRICT COURT CORRECTLY DISMISSED GRAVES' ADA ASSOCIATIONAL DISCRIMINATION CLAIM (COUNT I) BECAUSE SHE FAILED TO IDENTIFY ANY EVIDENCE THAT HER TERMINATION WAS A RESULT OF HER FATHER'S ILLNESS, AS OPPOSED TO HER WELL-DOCUMENTED PERFORMANCE DEFICIENCIES.**

Graves' argument regarding her ADA claim ignores the extensive record in this case, including the evidence of her longstanding performance deficiencies and the fact that the person she accuses of discrimination, CEO Mark Alfieri, was not a decisionmaker as to Graves' termination.

The purpose of the associational provision of the ADA is to prevent an employer from making an unfounded assumption that an employee who has an association with a disabled person will miss work to care for that person. *Columbia Lawnwood Regional Medical Center*, 54 F. Supp.2d 1159, 1165 (S.D. Fla. 1999). (citing H.R. Rep. No. 101-485, pt.2, at 61-62). The ADA does not require employers to accommodate nondisabled employees to care for a disabled family member or, in Graves' case, to prepare to move that person from one state to another. *See Hilburn v. Murata Elecs. N. Am.*, Inc., 181 F.3d 1220, 1230-31 (11th Cir. 1999).

To establish a *prima facie* case of associational discrimination, a plaintiff must show that: (1) she was subjected to an adverse employment action, (2) she was

qualified for the job at that time, (3) she was known by the employer at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raise a reasonable inference that the disability of the relative was a determining factor in the employer's decision. *Hilburn*, 181 F.3d at 1230-31. (quotations and brackets omitted). If a plaintiff establishes a *prima facie* case of discrimination and the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden then shifts to the plaintiff to show that the defendant's legitimate, nondiscriminatory reason is a pretext for unlawful disability discrimination. *Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 955 (11th Cir. 2015) (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242-43 (11th Cir. 2001)).

## A. Graves Failed to Establish a *Prima Facie* Case of Associational Discrimination.

Here, there is no evidence to establish the fourth element of the *prima facie* case. Graves had a long history of being counseled by her supervisors, Bettan and Farsi, for poor communication and attendance, for not completing her work, and for being disrespectful. [Doc. 22-4, p. 2, Doc. 22-1, pp. 58-61, 63-64 and Doc. 22-2, pp. 15, 17-18, 21, 26, 53 (DEF 139, 141-42, 145, 150, 184)] This counseling began long before Graves' father became critically ill and continued afterwards. [Doc. 22-1, pp. 118] There is no evidence of any connection between Graves' performance and attendance issues, on the one hand, and her father's illness on the other hand. Indeed,

during the entire period of Graves' employment, Graves' father was living in Pennsylvania. [Doc. 22-1, p. 116] Graves' direct supervisor Farsi, who was involved in the decision to terminate Graves' employment, confirmed that the decision had nothing to do with Graves' father or his illness. [Doc. 22-4, pp. 2-3]

Graves states that she was her father's primary caregiver, even though he was living in Pennsylvania. [Brief at 10, 11, 21] Assuming this is true, Graves points to no evidence to suggest that she informed BrandStar of this fact, or if she did, that anyone at the company was troubled by it. In fact, according to her own testimony, Graves' attendance issues were not related to caring for her father – they mainly had to do with taking care of her children because her ex-husband is "not a caregiver." [Doc. 22-1, pp. 15-16, 36, 55-56] On other occasions, Graves failed to report to work because of her own doctor's appointment or because she was taking care of her aunt. [Doc. 22-1, pp. 65, 81-82] There is no evidence that BrandStar terminated Graves' employment because of an unfounded assumption that Graves would miss work to care for her father, who was living a thousand miles away.

In her deposition, Graves speculated that BrandStar terminated her because she was unable to travel due to her father's future move to Florida [Doc. 22-1, pp. 112-113, 115-116] But even if this theory were true (and there is no evidence supporting it), it would not support Graves' claim of associational discrimination because BrandStar had no duty under the ADA to accommodate Graves' inability to

travel. *See Hilburn* 181 F.3d at 1231. The ADA does not require employers to accommodate employees acting as caregivers to disabled family members. *Id.*

In short, the record demonstrates that Graves' father's illness was not a factor in her termination and that Graves failed to establish a *prima facie* case of discrimination.

**B. There is No Evidence that BrandStar's Reasons for Terminating Graves Were Pretextual.**

BrandStar has articulated legitimate, nondiscriminatory reasons for Graves' termination – poor communication and attendance, not completing her work, and being disrespectful. Nevertheless, Graves argues that summary judgment should have been denied because there was a close temporal proximity between her emails to management concerning her father on May 2 and May 6, 2018, and her termination a few weeks later. [Brief at 22, 30] However, temporal proximity in the absence of other evidence is normally insufficient to establish pretext and defeat summary judgment. *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020).

No evidence of pretext exists in this case. Graves' May 2 email concerned a two-day trip to Pennsylvania that Graves took to visit her father in the hospital in Pennsylvania. [Doc. 22-1, pp. 141-144, Doc. 22-2, p. 47 (DEF 171)] In the preceding nine months and in the three weeks that followed that May 2nd email, *on more than ten occasions*, Graves' supervisors counseled Graves and submitted negative

feedback memoranda and negative performance reviews about Graves' not being in the office, not communicating with her supervisors about her schedule, not getting her work done, being disrespectful, not coming prepared for edit sessions, failing to ensure that products were on location for shoots, and failing to take responsibility and deflecting blame. [Doc. 22-1, pp. 58-61, 63-65, 67, 73, Doc. 22-2, pp. 15, 17-18, 21, 26, 29, 31-32, 34, 36, 53 (DEF 139, 141-42, 145, 150, 153, 155-56, 158, 160, 184), Doc. 22-4, p. 2] On March 14, 2018, Graves' supervisor Aharon Bettan noted in the conclusion of a lengthy "negative feedback" note about Graves: "She is just very difficult to work with and I'm not sure how we can make this work any longer." [Doc. 22-2, p. 34 (DEF 158)] In light of this undisputed evidence, it is fanciful to suggest that Graves' two-day trip to visit her father in the hospital, for which she received PTO, was the cause of her termination. Even assuming *arguendo* that it was, BrandStar had no duty under the ADA to accommodate Graves' absences from work to visit her father. *See Hilburn*, 181 F.3d 1230-31.

As for the May 6 email to BrandStar's CEO, Mark Alfieri, there is no evidence to suggest that this email had any causal connection to Graves' termination. It is undisputed that Graves was informed of her termination on May 25, 2018, and that the decision was made by Graves' supervisors, Bettan and Farsi. [Doc. 22-4, p. 2] Alfieri was not a decisionmaker. Alfieri testified in his deposition about a meeting he had with Graves *after* she had been terminated, a decision in which he was not

involved. [Doc. 25-3, p. 11] Since Alfieri was not involved in the termination decision, there can be no finding of any causal connection between Graves' May 6 email to Alfieri and her subsequent termination. Summary judgment on Count I was warranted.

## POINT III

### THE DISTRICT COURT DID NOT IMPERMISSIBLY WEIGH EVIDENCE.

Graves argues in section III of her brief that the District Court "construed inferences derived from facts in favor of Appellee and against Appellant." [Brief at 23] Graves cites two alleged examples of this, neither of which supports her case.

First, Graves argues that the District Court failed to accept Graves' statement that "I was never informed by anyone at BrandStar that I was *eligible* for FMLA to care for my father remotely or in-person." [Brief at 23] (emphasis added). But in its Order, the District Court was addressing a different contention by Graves – that "Defendant failed to advise Plaintiff of her *rights* under the FMLA." [Doc. 44:12] (emphasis added). Graves did, in fact, contend in her Response to Defendant's Motion for Summary Judgment that "she was generally unaware of her FMLA rights." [Doc. 25:10] The District Court noted correctly that Graves received BrandStar's Employee Handbook, which contained the company's FMLA policy. [Doc. 44:12] The policy expressly applied to leave for the serious health condition of family members. [Doc. 22-2, p. 59 (DEF 246)] In other words, the District Court

was addressing the fact that BrandStar met its FMLA *general notice* obligations to Graves.

It is true that BrandStar did not notify Plaintiff of her *eligibility* under the FMLA. But as explained above in Point II, BrandStar had no reason, and no obligation, to do so because Graves never notified BrandStar of her need for FMLA leave. *See* 29 C.F.R. §825.300(b)(1) ("*When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason*, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances.") (emphasis added). This was the basis of the District Court's decision to grant summary judgment on Count III of the Complaint: "Plaintiff did not provide the requisite notice to Defendant of her need for FMLA leave." [Doc. 44:12] This decision was correct.

Second, Graves argues that "the trial court somewhat sarcastically discredited the Plaintiff's evidence that she had traveled to attend to her father's emergency surgery and had attempted to claim PTO time for the two days she was out." [Brief at 23] The "sarcasm" Graves points to seems to relate to the District Court's use of quotation marks in stating that Graves "'accidentally' clocked in on those days because she had problems using the timekeeping application on her phone. [Doc. 44, p. 4] Graves testified that she "accidentally clocked in" on those days. [Doc. 22-1,

p. 144] It appears that the District Court was simply quoting Graves or Defendant's Motion for Summary Judgment (which also used the quotation marks) [Doc. 21, p. 7], rather than sarcastically discrediting her on a point that BrandStar did not even dispute. To be clear, whether Graves intentionally or accidentally clocked in those days is irrelevant. The relevant point is that because she clocked in, BrandStar could not have known that she needed leave from work. And even after correcting her error and designating those days as PTO, Graves still failed to request FMLA leave as required by BrandStar's policy. *See* 29 C.F.R. § 825.302(d); § 825.303(c) (an employer may require that the employee "comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.").

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court correctly granted BrandStar summary judgment on each count of Plaintiff's Complaint. The District Court's decision should therefore be affirmed.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(a)(7)(b)(iii), this document contains <u>8068</u> words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with Times New Roman 14-point font.

*/s/ Richard D. Tuschman*
Counsel for Appellee
February 3, 2022

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 3, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served via Federal Express this date on all counsel of record on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>**/s/ Richard D. Tuschman**</u>
Richard D. Tuschman, Esq.

<u>**SERVICE LIST**</u>

G. Ware Cornell, Jr., Esq.
Florida Bar No. 0203920
ware@warecornell.com
brittne@warecornell.com
**CORNELL & ASSOCIATES, P.A.**
2645 Executive Park Drive
Weston, FL 33331
Tel: (954) 641-3441

*Attorney for Appellant*